**CARIBOU FOUR CORNERS, INC., a Wyoming corporation, Appellant (Plaintiff),**

v.

**CHAPPLE–HAWKES, INC., a Wyoming corporation, Appellee (Defendant).**

No. 5604.

Supreme Court of Wyoming.

April 7, 1982.

D. Terry Rogers, Jackson, for appellant.

Floyd R. King, Jackson, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

On July 21, 1981 appellant filed suit seeking a court order adjudging it to be the owner of a prescriptive easement across appellee's property. The case proceeded to trial on August 18, 1981. At the close of the appellant's case, the district court granted appellee's motion for a judgment in favor of the defendant. From that judgment this appeal has arisen.

Appellant's brief provides the following statement of the issues:

1. The trial court erred in granting appellee's motion for a judgment in favor of defendant at the end of the presentation of appellant's evidence and thereafter granting appellee judgment.

2. The evidence at the trial is undisputed with respect to the fact that appellant and its predecessors used the disputed land for a period of time from 1964 to 1981 adversely, continuously and uninterruptedly, under claim of right, and for the prescriptive period.

3. There was no evidence presented at the trial that the use of the disputed land by appellant and its predecessors in title

was in any way permissive during the period of time over which the disputed land was possessed adversely, and, accordingly, appellee failed to sustain its burden.

We will affirm.

■ In a nonjury case such as this one, where the district court dismissed the plaintiff's suit at the close of its evidence, this court on appeal must consider the evidence as it would had the district court directed a jury verdict. *Fuller v. Fuller*, Wyo., 606 P.2d 306 (1980). If we find that the plaintiff presented a prima facie case based on unimpeached evidence, we must reverse. *Arbenz v. Bebout*, Wyo., 444 P.2d 317 (1968).

In order to understand the underlying facts in this case we have discovered the following diagram necessary:

This diagram shows the station owned currently by appellant—Caribou Four Corners—as it now appears.

The station was originally built in 1963 and commenced operating during that summer. At that time there were no curbs and no frontage road. Access to the station was obtained by driving off the highway's shoulder and across dirt and gravel at whatever angle the customer desired. Sometime during that summer gravel was hauled in and placed so that it fanned out from the pumps in an attempt to make them more accessible to the customers.

The operator of the service station from 1963–1974—Gerald Bagley—testified that in 1963 he knew where the property line was and that the vehicles entering the station frequently crossed the land now owned by appellee—Chapple-Hawkes; these vehicles included tanker trucks delivering gas to the station. Mr. Bagley also indicated that he frequently parked cars across the property line on the neighboring landowner's property. When asked if the neighboring landowner agreed to this, Mr. Bagley said:

"A. Not agreed. It was just one of those things that happened. They didn't say not to, they didn't say to."

Mr. Bagley testified that, while he operated the station from 1963 to 1974, the station was open only during Jackson's summer season—basically June through August. Mr. Bagley noted one exception to that; though he did not recall the particu-

lar year, he remembered trying to keep the station open through the winter.

In 1968 the highway in front of the station was repaved complete with curbs and a frontage road which was separated by islands as shown in the diagram. At that time, according to Mr. Bagley's testimony, asphalt was placed over the gravel approaches to the service station; this too is depicted on the diagram where it can be seen that the asphalt crossed the property line.

Mr. Bagley, who operated the station without a written lease agreement, also operated a fireworks stand. Thus from the photographs admitted into evidence and the testimony, it appears that the stand was located at the edge of this asphalted area. This stand was located across the property line on what is now Chapple-Hawkes' property. According to the evidence this was included in the area claimed subject to the prescriptive easement. Mr. Bagley testified as follows:

"Q. Over the years did you even operate a fireworks stand on the Gettings [Chapple-Hawkes' predecessor in interest] property?

"A. Yes.

"Q. And you know when that was?

"A. I can find it in here. I know there is a reference to it in here. It would take a few minutes to find it.

"Q. And was that an agreement with Gettings?

"A. No.

"Q. And what arrangement was made to do that?

"A. That was with Chapple and Hawkes.

"Q. That was after Chapple and Hawkes became the owners?

"A. Yes.

"Q. And did you make arrangements with Chapple and Hawkes to do that?

"A. I don't want to be wrong here but I'm quite confident it was with Chapple and Hawkes. Yes, it would have been with them. Surely.

"Q. And when was that if you recall, approximately?

"A. I don't know.

"Q. What was your arrangement with them?

"A. I would have paid them rent.

"Q. And for that use of the property, what right did that give you?

"A. The right to sell, to have that stand there. The fireworks stand.

"Q. And you did pay them a consideration for that?

"A. I'm sure I did, sure.

"Q. All right. And in connection with your use of that fireworks stand—that was located north of the Caribou Oil property line, was it not?

"A. It is east to me.

"Q. Assuming that on this little sketch here, that the direction toward the motel, you consider that east?

"A. Yes.

"Q. Okay. So it would be east of the property line and on the Chapple-Hawkes property that you operated it?

"A. Right.

"Q. And that was during the period of time that you operated the gas station itself?

"A. Yes.

"Q. And during that period of time, then, you would use it for parking and for your customers; is that correct?

"A. Right. Yes."

Mr. Bagley was later given an opportunity to go through his records to find what years this agreement with Chapple-Hawkes was in effect. However, he testified that he could not find any documentation which could help him recall what years he leased the Chapple-Hawkes property in order to run the stand. However the record also indicates that Lowell Hawkes and Bert Chapple did not obtain title to the property until 1970 (in 1972 they conveyed the property to the corporation known as Chapple-Hawkes, Inc.). Therefore, the several years of operating a fireworks stand pursuant to an agreement with Hawkes and Chapple could not have occurred before 1970 or after 1974 when Mr. Bagley left the service station.

The law of this state is clear. A prescriptive easement cannot be acquired without continuous and uninterrupted adverse use for at least ten years. Section 1–3–103, W.S.1977.[1] It is the burden of the party claiming such an easement to prove every element. *Gregory v. Sanders*, Wyo., 635 P.2d 795 (1981). It must be further remembered that prescriptive easements are not favored in law, and thus entry into another's possession is presumed to have been with the landowner's permission absent evidence of a hostile entry. *Shumway v. Tom Sanford, Inc.*, Wyo., 637 P.2d 666 (1981); and *Gray v. Fitzhugh*, Wyo., 576 P.2d 88 (1978). And without a hostile entry, the use cannot be adverse. *Yeckel v. Connell*, Wyo., 508 P.2d 1200 (1973).

In order for appellant to have been entitled to have this case continue he must have made a prima facie showing that there had been a continuous adverse use for at least ten years. Since the suit was filed in 1981, and the use admittedly did not start until at least 1963, what occurred during the years 1971–1973 is crucial to appellant's claim. There must have been an adverse use during that two-year time period in order for appellant to string together ten years of continuous use—whether it be 1963–1973, 1971–1981, or any combination in between. However the evidence fails in particular to show a clearly hostile assertion of a right to use the land now owned by appellee during that time period. In fact, if anything, the evidence establishes a permissive use. Sometime between 1970 and 1974, Mr. Bagley—appellant's tenant—leased the land in question here in order to operate a fireworks stand on it.[2] He testified that this was done, not for just one year, but for several years. He was unable to say for sure what years he operated the stand under the lease, and was unable to find a copy of the lease which would have shown exactly how much land was leased or what his rights were under the lease.

Nonetheless we know that appellant's lessee—Mr. Bagley—operated a fireworks stand on appellee's property for several years between 1970 and 1974; included was at least a part of the critical 1971–1973 time period. Since Mr. Bagley paid for the right to use the land, the use was permissive and not adverse or hostile. We have no reason to believe that the lease barred use of the land for the benefit of the service station, either by the station's customers or by tanker trucks delivering gas. Accordingly we must conclude the appellant failed to make a prima facie showing of a ten-year continuous and adverse use. The appellant simply failed in its proof in a judicially unpopular cause to take another's land. The district court correctly found against appellant at the close of its case.

Affirmed.

---

1. Section 1–3–103, W.S.1977 provides:

   "An action for the recovery of the title or possession of lands, tenements or hereditaments can only be brought within ten (10) years after the cause of such action accrues."

2. We need not decide the question of whether a landlord may claim the adverse use made by his tenants of another's land without an express or implied provision allowing such use in the lease, or even whether such implied provision may have been shown in this case.