2002 WY 23

**LINCOLN COUNTY BOARD OF COMMISSIONERS, Appellant (Respondent),**

v.

**Lawrence L. COOK and Christy Cook, Appellees (Petitioners).**

No. 00–339.

Supreme Court of Wyoming.

Feb. 8, 2002.

---

Representing Appellant: Scott A. Sargent, Lincoln County Attorney; John D. Bowers, Deputy Lincoln County Attorney; and James K. Sanderson, Deputy Lincoln County Attorney, Kemmerer, WY.

Representing Appellees: V. Anthony Vehar of Vehar Law Offices, P.C., Evanston, WY.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] This appeal arises from the Lincoln County Board of Commissioners' (the Board) determination that a public road should be established, by prescription, over property owned by Lawrence and Christy Cook (the Cooks). The Cooks appealed the Board's decision to the district court, which reversed the Board. The Board now appeals from that ruling. We affirm the district court's decision.

## ISSUES

[¶ 2] The Board, as appellant, states the issues as follows:

I. Did the district court, erroneously substitute its judgment for the trier of facts of the first instance, the Board of Lincoln County Commissioners.

II. Did the district court err in its interpretation of Wyo. Stat. § 24–1–101 and the doctrine of prescriptive easements in the State of Wyoming.

III. Was the "Order Establishing Little Coal Creek Road Number 12–344 Across the Property of Lawrence L. Cook and Christy Cook" by the Lincoln County Board of Commissioners (a) arbitrary and capricious, an abuse of discretion or not otherwise in accordance with law; (b) in excess of statutory jurisdiction, authority of limitations or lacking statutory right; (c) contrary to a constitutional right, power, privilege or immunity; (d) unsupported by substantial evidence.

The arguments by the Cooks, as appellees, are essentially framed in the context of the issues raised by the Board.

## FACTS

[¶ 3] At issue in this appeal is a one-quarter mile section of "ungraveled" or dirt two-track road in remote Lincoln County known as the Little Coal Creek access road (Coal Creek road). The quarter-mile section crosses property owned by the Cooks. In 1995, the Cooks acquired this property from P & M Mining Company (P & M), which had acquired the property from Kemmerer Coal Company.[1] Prior to the Cooks' ownership, the property was "unenclosed" or considered "open range."[2]

[¶ 4] Coal Creek road connects Fontenelle Creek road and Pomeroy Basin road, both of which are "considered county roads that the County maintained and the public used...." Coal Creek road provides access to private property and "good" access[3] from the south to the back side of "Miller Mountain and Coal Creek, Cabin Creek and the Fontenelle drainage area ..." in addition to Fort Hill. Coal Creek road is periodically impassable during the winter due to snow and during the spring due to water runoff.

[¶ 5] In the 1980s, the Board requested that Paul Scherbel, the county land surveyor, provide them an overview of the county's road system, which was in "shambles." At that time, Lincoln County had only officially dedicated one county road, which the Board later attempted to vacate, but ultimately did not due to public opposition. The Board began updating its road system, a process that included acquiring and establishing county roads by prescription. As part of this process, Mr. Scherbel recalled that in 1980 he, Edwin Kirkwood, and then-county commissioners Nancy Peternal and Jim Herschler

---

1. The record does not indicate when P & M or Kemmerer Coal Company acquired the property.

2. There is some indication that gates were recently placed on the property.

3. At least two similar roads provide access to this area, but apparently are impassable.

viewed Coal Creek road, presumably including the section crossing what is now the Cooks' property, and considered establishing it as a county road. The Board decided not to establish Coal Creek road as a county road at that time.

[¶ 6] In July 1997, the Board elected to establish Coal Creek road as a county road based on the common law doctrine of prescription. The Board recorded a plat and published and served notice on area landowners in accordance with Wyo. Stat. Ann. § 24–1–101 (LexisNexis 2001). The Cooks objected to the county establishing a section of the road across their property, while other landowners apparently did not formally object to the Board's decision. On August 8, 1997, the Board held an open meeting to consider objections to the proposed road, and subsequently entered a formal resolution establishing the road as a county road. The Cooks appealed this determination to the district court. Both parties subsequently stipulated that the case be remanded for a contested case hearing before the Board.

[¶ 7] The Board appointed a hearing examiner and held a contested case hearing on September 3, 1998. The Board heard from several witnesses, including former county commissioners, county employees, area landowners, and members of the public. Their testimony, which tended to lack specificity, primarily concerned Lincoln County's maintenance of Coal Creek road and the public's historical use of the road.

[¶ 8] Regarding road maintenance generally, the Board found that until Lincoln County "completed the process of formally establishing its roads, the County maintained roads commonly accepted as county roads and private roads, both on a year round and seasonal basis." Nancy Peternal, a county commissioner from 1979 to 1987 and liaison to the south Lincoln County road and bridge department, testified that when she became a commissioner, Lincoln County had been plowing ranch roads "for years" without a set schedule. In addition, there were certain county roads that were maintained during the season they were open (i.e., May to November), and other "noncounty" roads that were never graveled, but "plowed in the win-

ter, considering it an emergency for a rancher to be able to get out or something." Regarding roads not considered to be county roads, the department "looked around to see if they could plow another road" when "they got caught up with their work...."

[¶ 9] Ms. Peternal recalled that in 1980 and thereafter, the Board discussed whether the county should continue maintaining private ranch roads, and in the mid 1980s, the Board decided that it would no longer maintain these roads. Edwin Kirkwood, county road and bridge department supervisor until 1988 and a thirty-four year employee of the department, testified:

> [I]n 1985 [the Board] start[ed] cutting out going into the ranch—all these ranch roads, and working on them. We used to blade them, build them, work on them, snow removal on them and they more or less stopped—started stopping that around 1985, and it went on down to, I guess, present to what they're doing now....

Everett Cassidy, county commissioner from 1989 to 1992, testified that prior to 1989, the county had implemented an "understanding" with the road and bridge department that it would not maintain private roads, and stopped doing so.

[¶ 10] As to Coal Creek road specifically, Mr. Kirkwood recalled that in the 1950s, Continental Oil had drilling set "up in there somewhere and we, we would blade the road for them a few times," but not every year. Myles McGinnis, whose family owns land on Coal Creek road, also remembers the county making passes on Coal Creek road in the springtime during the 1950s or 1960s "when Ed Herschler was on the Commission" (the Herschlers owned property on Coal Creek road adjacent to what is now the Cooks' property).

[¶ 11] In the 1960s, the department put "some culverts" in the road, "in different places going through there." According to Mr. Kirkwood, the department would then blade the road once or twice per year, depending on the weather as "ranchers wanted, more or less, more blading to get through there." In the 1970s, the department bladed the road "on and off." However, at the time

the county changed its maintenance policy regarding private ranch roads (in 1981, 1984, 1985 or 1986), the Board "started cutting off all this work on private roads throughout the county" because "[t]hey were starting to form their own county roads at that time," but also "more or less went back into certain other private work. It was hard to follow what the commissioners would do at that time." When asked if the continued maintenance of private roads "depended upon who was getting the most requests from ranchers," Mr. Kirkwood replied that he "imagine[d] that's how you would say it, yes." Blading continued on Coal Creek road until 1986, but not thereafter, according to Mr. Kirkwood. He considered the road to be not "as private as going into a ranch," but "public" because "everybody was using it for some reason or another."

[¶ 12] The road and bridge department informed Ms. Peternal that the county "maintained" Coal Creek road at least once per year, but she did not personally observe this maintenance, could not recall when she was so informed, or who had provided the information. According to Ms. Peternal, Kemmerer Coal Company did not object to the maintenance.

[¶ 13] Rem Borino, a longtime county road and bridge department employee, testified that for five or six years prior to 1981, he would "blade" Coal Creek road each spring "[u]nless it got really tore up bad in a rainstorm or something like that. They'd call me back down" and he would "smooth it off." After 1981, he continued to blade the road until he retired from the department (he was "too glad to retire" and could not recall the date he retired). Mr. Borino did not blade Coal Creek road of his own accord, stating "[t]hey just asked me. And I says, Ask the Commissioners. The Commissioners tell me the next day, Go to the Kralls', go to a lot of places."

[¶ 14] Ron Cattelan, a county road and bridge department employee, testified that he began working for the county in 1979 as an equipment operator. Between 1981 and 1983 or 1984, Cattelan recalled blading Coal Creek road once, and "maybe once or twice a summer" or when "it would wash out a lit-tle." He also installed a pipe in a "seep" on what is now the Cooks' property, possibly prior to 1981. Mr. Cattelan thought the county quit maintaining the road in 1985 or 1986, but was not certain.

[¶ 15] Margaret Gergen, a county road and bridge department employee, testified that she first began working for the county in 1981 as an equipment operator. Between 1981 and 1988, she worked on "that road" "usually twice a year unless somebody called and needed something done." However, when asked what type of "work" she had done, Ms. Gergen described work performed on areas of Coal Creek road that did not cross the Cooks' property and stated that the last time she had "bladed" the road was 1988, and not thereafter because she "was not told to blade the road." To Ms. Gergen's knowledge, the primary reason she worked on the road was because "the ranchers would ask for it to be done."

[¶ 16] Corby McGinnis, whose family owns land adjacent to the Cooks' property, testified that her family bladed Coal Creek road in 1986 so that they could transport hay and additionally whenever the road washed out. They continued to blade the road when necessary to transport hay or "sometimes in the spring" to get equipment to their property.

[¶ 17] In the summer of 1981, the county road and bridge department installed a flat-bed railroad car bridge where Coal Creek road crosses Fontenelle Creek on what is now the Cooks' property. The bridge was placed approximately fifty to one hundred twenty feet south of the original roadway, as there were "many tracks" where people had become stuck while attempting to cross the creek.

[¶ 18] Ms. Peternal testified that "some people up there" requested the bridge and the bridge was offered to the county "to put on that road" to provide access to ranchers because the people "using that road had— had great difficulty crossing it at times. And it seems to me it had to do with moving their cattle." She later stated that the bridge was also installed for the general public. It is not clear whether the county actually paid for

the bridge. Mr. Kirkwood was aware that the property was owned by Kemmerer Coal Company, and did not recall asking permission to perform the work associated with installing the bridge. Ms. Peternal knew that the legal work necessary to establish Coal Creek road as a county road had not been performed, and did not determine, or ask anyone to determine, who owned the property prior to installing the bridge. She similarly did not recall Kemmerer Coal Company objecting to the bridge, but the Board did not ask permission to install it, nor did she recall Kemmerer Coal Company expressly granting the county permission to do so. She considered roads such as Coal Creek road "public roads" because "they were open to the general public."

[¶ 19] A prior board of commissioners had placed two bridges on private ranch property (interestingly, Peternal property) without the property owner's knowledge, but Ms. Peternal recalled seeing "something signed by the previous Commission saying that they had permission to do this." Calvin Barnes, a rancher who has lived north of Kemmerer since 1952, testified that pursuant to an agreement, the county also installed a bridge on his property knowing that it was private property and not a county road. The county apparently agreed to install the bridge on Barnes' property in exchange for access to a "shortcut" when transporting county equipment to LaBarge.

[¶ 20] According to Ms. Gergen, once the bridge was positioned, some roadwork was necessary to facilitate moving the department's equipment to the bridge site. The department also installed one culvert (not on the Cooks' property), extracted some road material from a corner that was straightened, built road approaches to the bridge (the area was marshy due to spring runoff and people had crossed Fontenelle Creek at multiple locations), and installed at least one culvert on each side of the bridge. Mr. Kirkwood also recalled that, at the time the bridge was installed, Coal Creek road had been widened a bit on property other than the section at issue in this appeal. He noted that the bridge increased the road's use by

making the creek crossing passable and that in 1986 or 1987, the Herschler ranch, as opposed to the county, installed a new "deck" on the bridge.

[¶ 21] Several witnesses described the public's historical use of Coal Creek road. Ms. Gergen recalled first using Coal Creek road when she was "ten years old," and periodically thereafter with her family to go camping, "chicken hunt[ing]" and "exploring." She still uses the road, presumably for the same purposes, and no one informed her that she could not use the road. Mr. Borino used Coal Creek road "every once in a while, hunting chickens or doing anything"[4] during hunting season, but had not used the road "for a long time." Similarly, no one denied him access to the road, and it was his understanding that the landowner was being "neighborly and accommodating" in allowing hunting on the property. Mr. Cattelan began using Coal Creek road about three times per year in 1976 for hunting, and continued to use the road after the bridge was installed. The property apparently was not posted with "no trespassing" or "no hunting" signs.

[¶ 22] Kent Connelly, Lincoln County search and rescue captain and former commander, testified that he first became aware of Coal Creek road in 1983 or 1984, and until 1997, used the road fifteen to twenty times per year (primarily in September and October) for hunting and search and rescue purposes. No one denied Mr. Connelly access to the property; however, he recalls "discussions" with P & M (he was jumping through "the hoops of going through private landowners to ask for access") regarding search and rescue's access to the property and stated that P & M gave him express permission to cross the property for such a purpose. He also recalled that approximately ten years prior to 1998, unspecified ranchers posted a no trespass sign "to keep people out of there," but it was "taken down later on."

[¶ 23] Sue Hunt, a local rancher, testified that her family has resided near Coal Creek road since 1886 and that she has resided there full time since 1976. She "thinks" that her family used the road since 1912 to trans-

---

4. Much to the Board's dismay, Mr. Borino would not reveal the "good" chicken hunting locations.

port cattle between their property and leased forest land. Ms. Hunt apparently still utilizes the road to transport cattle twice per week between May and November. She just "used" the road, without obtaining permission, and no one restricted her use of the road. At some point, she assumed that the property belonged to the Bureau of Land Management.

[¶ 24] Joe Krall, and his parents before him, owned a ranch adjacent to what is now the Cooks' property until the McGinnis family purchased it in 1987. He testified, without specific reference to time periods, that he used Coal Creek road when other roads were "too muddy" to get to town, and used the road to transport cattle to another ranch. He observed the county perform maintenance on the road, but could not recall when. He did not recall anyone excluding him from using the road. However, "whenever you wanted to build, you know, a portion of the road and it was better for the road to be there, Kemmerer Coal would just give you permission to—and the county permission to do it." He changed a section of the road through his property, "through P & M" and around a hill (apparently not the road's historical location). According to Mr. Krall, P & M "thought if you put the road in a better position and if they happened to move their industry up there, it would be better for them, too, to have an improved road."

[¶ 25] Myles McGinnis, whose family purchased Mr. Krall's property in 1987, is a forty-nine-year resident of Fontenelle Creek road. He has used Coal Creek road all "his life" for ranch purposes relative to his Fontenelle Creek property, leased property adjacent to what is now the Cooks' property, and the property his family purchased from Mr. Krall. He and his family still use the road in caring for their cattle, irrigating, and summer "back and forth" travel. No one has restricted Myles McGinnis' access to the road. He recalled having a "gentleman's agreement" with one of P & M's lessees that allowed McGinnis to cross the property— "the access was there." According to McGinnis, in order to be "neighborly and accommodating," one allows other ranchers to cross one's property if necessary "once a historic pattern has been set."

[¶ 26] John Povsche, a seventy-two-year-old retired welder, testified that he grew up just south of the disputed section of road, and was aware of its existence at age ten. He uses Coal Creek road every fall to retrieve wood. His father leased some nearby property from Kemmerer Coal Company, no one ever told him not to use the road (even after this lease expired), and he never had to ask permission to use the road.

[¶ 27] Ron Lockwood, a wildlife biologist for the State of Wyoming, testified that Coal Creek road is the "main access" from the south for all the hunted species in the Miller Mountain/Fort Hill area, and he has observed "mushroom collectors, recreationalists, antler collectors" and bear hunters use the road. Mr. Lockwood uses the road "[p]retty regularly" in the fall during elk and antelope season.

[¶ 28] Steven Ellinwood, senior counsel for P & M and its corporate representative for purposes of the contested case hearing, testified that P & M manages and operates several mineral properties (primarily coal-related) for Chevron USA in Lincoln County. Much of this property is considered "open range," some of which P & M leases to area ranchers. P & M restricts public access at its active mine locations for "safety" reasons, but for "open range" property, including what is now the Cooks' property, the company's policy was to "allow permissive lawful public use." "It was permissive use, primarily for the ranchers in the local area;" a "course of dealing" among area property owners to facilitate each other's use of the land, including "old trails that are used by ranchers and the public to access the various public lands and adjoining private tracts of land," and once P & M became a property owner, it "followed that practice in the area."

[¶ 29] When asked if he was aware that the road had "been bladed on an annual basis by a road grader," he replied that he was not, but was aware a bridge had been placed on the property. However, based on his discussions with land department personnel, the mine manager and mine personnel, and his review of company land records, "the

management at the Kemmerer mine, during the period of their ownership with that tract, was aware of ... what was taking place in that area" and "regarded that to be a permissive use of that roadway." Mr. Ellinwood further testified that P & M regarded the "bridge across that portion of land that was owned by P & M to be a permissive use."[5]

[¶ 30] According to Mr. Ellinwood, P & M controls approximately 22,000 acres of open range and forest land in the area, which contains access routes to public land and adjoining private land "where permissive use is currently allowed." If prescriptive rights were enforced across this property, it would necessitate posting or fencing the area to ensure that the public is not allowed access without first obtaining express permission.[6] Nancy Peternal acknowledged that during her tenure on the Board, it was "pretty well known" to her, the Board and the "community at large" that Kemmerer Coal Company allowed public access to its "thousands of acres of property with the exception of the mine itself."

[¶ 31] The Board entered detailed factual and legal findings in its February 3, 1999, Order Establishing Little Coal Creek Access Road Number 12–344 Across the Property of Lawrence L. Cook and Christy Cook. The Board concluded that the evidence satisfied the statutory and legal requirements for establishing, by prescription, Coal Creek road as a county road across the Cooks' property, primarily because the property's prior own-

ers had not expressly granted permission for the public's use of the road or the county's maintenance of the road, and had not otherwise restricted access to the road.

[¶ 32] The district court reversed the Board's determination due to the "abundance of supporting evidence demonstrating permissive use," and this appeal followed.

## STANDARD OF REVIEW

[¶ 33] Wyo. Stat. Ann. § 24–1–101(b) provides that the "proceedings on appeal shall be governed by the Wyoming Administrative Procedure Act." Therefore, we accord no special deference to the district court's decision and will consider the case as if it came directly from the agency. *In re Jensen*, 2001 WY 51, ¶ 9, 24 P.3d 1133, 1136 (Wyo.2001). Our review is limited to a determination of the factors specified in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2001). The reviewing court shall:

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

* * * .

(E) Unsupported by substantial evidence in a case reviewed on the record

---

5. This aspect of Mr. Ellinwood's testimony began as follows:

> Q. [BY DEPUTY COUNTY ATTORNEY] Mr. Ellinwood, as far as the other aspect of it—we've covered the permissive aspect of placing a bridge on P & M property. Would you consider the placement of a bridge and annual blading of a road to be lawful public use of P & M property?
> A. No, not necessarily.

When asked by counsel for the Cooks to explain this answer, Mr. Ellinwood, who testified by telephone, replied as follows:

> A. Well, I think every—every—actually, I'm frankly not sure what the question was, because you were cutting out. But if I understood the question right, you asked me whether I would regard the blading of the road and the placing of a bridge to be lawful public use. And I said, Not necessarily. Is that a correct summary of the question and answer?
> Q. It is.

A. And you want me to explain my answer?
Q. Yes, sir.
A. Well, let me explain it in the context of the particular tract in question. Those were the facts that were were obtained during the period of P & M's ownership. And P & M regarded the Larry Cook tract and the Fontenelle Road and bridge across that portion of land that was owned by P & M to be a permissive use.
Q. But it may not be under some other circumstances; is that fair?
A. I'd say that's fair.

6. A land agent for Pacificorp testified that it has a policy similar to that of P & M's regarding its "good deal" of property in south Lincoln County, and echoed the potential implications of enforcing prescriptive rights across its property based on the circumstances of this case.

of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c).

[¶ 34] The interpretation and correct application of Wyoming statutes are a question of law over which our review authority is plenary. *In re Jensen,* 2001 WY 51, ¶ 10, 24 P.3d at 1136. We affirm an administrative agency's conclusions of law only if they are in accord with the law. We do not afford any deference to the agency's determination, and we will correct any error made by the agency in either interpreting or applying the law. *Id.*

[¶ 35] In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. *Id.* If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusion, so long as there is more than a scintilla of evidence. *Id.* Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, the reviewing court can discern a rational premise for those findings. *World Mart, Inc. v. Ditsch,* 855 P.2d 1228, 1236 (Wyo. 1993) (*quoting Mekss v. Wyoming Girls' School, State of Wyoming,* 813 P.2d 185, 200 (Wyo.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992)).

## DISCUSSION

[¶ 36] The Board argues that, based on the text of Wyo. Stat. Ann. § 24–1–101 and our decisions in *Steplock v. Board of County Com'rs for Johnson County,* 894 P.2d 599 (Wyo.1995); *Koontz v. Town of Superior,* 746 P.2d 1264 (Wyo.1987); and *Big Horn County Com'rs v. Hinckley,* 593 P.2d 573 (Wyo.1979), a claimant seeking to establish a public easement by prescription should have a different or lesser burden than a claimant seeking to establish a private easement by prescription. The Board also contends that substantial evidence supports its findings in establishing a county road, by prescription, across the Cooks' property. According to the Board, Lincoln County's maintenance of Coal Creek road rebuts any presumption of permissive use, mere silence or acquiescence by the property's owners under these circumstances is insufficient to create an inference or presumption of permissive use, and the Cooks failed to demonstrate that their predecessors expressly permitted the public's historical use, or Lincoln County's maintenance, of Coal Creek road.

### Wyo. Stat. Ann. § 24–1–101 and the Common Law

[¶ 37] Wyo. Stat. Ann. § 24–1–101 provides:

(a) On and after January 1, 1924, all roads within this state shall be highways, which have been or may be declared by law to be state or county highways. It shall be the duty of the several boards of county commissioners, within their respective counties, prior to said date, to determine what, if any, such roads now or heretofore traveled but not heretofore officially established and recorded, are necessary or important for the public use as permanent roads, and to cause such roads to be recorded, or if need be laid out, established and recorded, and all roads recorded as aforesaid, shall be highways. No other roads shall be highways unless and until lawfully established as such by official authority. *Except, nothing contained herein shall be construed as preventing the creation or establishment of a public highway right-of-way with reference to state and county highways under the common-law doctrines of adverse possession or prescription either prior to or subsequent to the enactment hereof.* If any such board shall resolve the creation or establishment of a public highway right-of-way based upon the common-law doctrines of adverse possession or prescription, it shall, following the filing of a plat and accurate survey required in accordance with the terms and provisions of W.S. [§ ]24–3–109, proceed with the publication of the proposed road for three (3) successive weeks in three (3) successive

issues of some official newspaper published in the county * * *.

* * *

(b) The county commissioners shall cause a copy of the above notice to be mailed by registered or certified mail to all persons owning lands or claiming any interest in any lands over or across which the road is proposed to be created or established. The publication, posting and mailings of such notice shall be a legal and sufficient notice to all persons owning lands or claiming any interest in lands over which the proposed road is to be created or established. No viewers or appraisers shall be appointed, nor shall any damage claims be considered or heard, and *the sole objections to be heard by the board shall be directed against the creation or establishment of such right-of-way under the common-law doctrines of adverse possession or prescription.* Any objector may appeal from the final decision of the board of the county commissioners to the district court of the county in which the land is situated. * * *

* * *

(d) *Only that portion of county highways, not to exceed sixty-six (66) feet in width,[7] which was actually constructed or substantially maintained by the county and traveled and used by the general public for a period of ten (10) years or longer, either prior to or subsequent to the enactment hereof, shall be presumed to be public highways lawfully established as such by official authority.*

(Emphasis added.)

▆▆▆ [¶ 38] The statute sets forth both procedural and substantive requirements a county must satisfy to establish a county road by prescription. *Steplock*, 894 P.2d at 604–06. In support of the district court's decision to reverse the Board, the Cooks do not contend that the Board's findings as to the requisite notice, recorded plat, or the procedures used by the Board in this case

are deficient. The statute's "substantive requirement" is incorporated "by alluding to the common-law doctrines of adverse possession or prescription." *Id.* at 605. "This feature was added to the statute in 1967 by express grant of authority to counties to establish such roads. In expressly referring to the common-law doctrines, the statute incorporates the prior decisions of this court." *Id.* The statute, and our prior decisions, demand that "an action to take property from private owners without compensation must be accomplished with strict adherence to the statutory requirements for the proceeding." *Id.* at 606.

▆▆▆ [¶ 39] At common law, one must show adverse use, under color of title or claim of right, such as to put the owner of the servient estate on notice that an adverse right was being claimed, and that the adverse use was continuous and uninterrupted for ten years. *A.B. Cattle Co. v. Forgey Ranches, Inc.*, 943 P.2d 1184, 1188 (Wyo.1997); *Prazma v. Kaehne*, 768 P.2d 586, 589 (Wyo.1989); *Koontz*, 746 P.2d at 1268. The party claiming an easement has the burden of proof, and such a claim is not favored. *Prazma*, 768 P.2d at 589.

▆▆▆ [¶ 40] Adverse or hostile use is use inconsistent with the owner's rights, without permission asked or given, such as would entitle the owner to a cause of action against the intruder. *Koontz*, 746 P.2d at 1268 *(quoting* 7 R. Powell and P. Rohan, *Powell on Real Property* § 1013[2] at 91–18 (1987)). The claimant must demonstrate how its actions would give notice to the landowner of the adverse use and adverse nature of his claim. *Prazma*, 768 P.2d at 589. Use "by permission or sufferance" cannot ripen into title, "no matter how long continued." *Board of County Com'rs of Sheridan County v. Patrick*, 18 Wyo. 130, 104 P. 531, 532–33 (1909); *see Koontz*, 746 P.2d at 1268. However, a property owner's failure to interrupt or object to the public use of his property for the statutorily prescribed period cannot be

---

**7.** The Board found that the "width of the roadway through the [Cooks'] property is the area actually maintained by the County which is generally thirty (30) feet in width but does not exceed sixty-six (66) feet in width." In support of the district court's decision to reverse the Board, the Cooks do not contest the width of the road as established by the Board, which is also indicated on the recorded plat.

equated with permissive use. *Koontz*, 746 P.2d at 1268.

[¶ 41] Open, notorious, and continuous use is not sufficient, in and of itself, to justify granting a prescriptive easement; the use still must be adverse. *Weiss v. Pedersen*, 933 P.2d 495, 501 (Wyo.1997) (*quoting Shumway v. Tom Sanford, Inc.*, 637 P.2d 666, 670 (Wyo.1981)); *A.B. Cattle Co.*, 943 P.2d at 1189. In the instant case, it is use by the public, coupled with maintenance by the county, that "gives rise to the right to establish a county road by prescription" under the statute; in other words, " 'in addition to the use of a road by the public, the assumption of control and jurisdiction over it by the board of county commissioners for the statutory period of limitation' " must be demonstrated. *Steplock*, 894 P.2d at 605, 606 (*quoting Board of Com'rs of Sheridan County v. Patrick*, 18 Wyo. 130, 107 P. 748, 750 (1910)). Maintenance by the county is necessary to show a "claim of right in the public," the extent of which need only be "as much as may be necessary to keep the road in substantial repair or to put it in condition for public travel." *Koontz*, 746 P.2d at 1269. However, the road is not established "until the county commissioners formalize their actions in accordance with the statute" and make " 'manifest the county's purpose to acquire the lands involved.' " *Hinckley*, 593 P.2d at 579 (*quoting Rocky Mountain Sheep Co. v. Board of County Com'rs of Carbon County*, 73 Wyo. 11, 269 P.2d 314, 319 (1954)).

EVIDENTIARY PRESUMPTIONS

[¶ 42] The Board argues that our prior decisions distinguish between public and private prescriptive easements and that the statute's text, combined with our decisions regarding claimed public prescriptive easements, create a lighter burden for public prescriptive easement claimants, as well as an evidentiary presumption that the claimant's use is adverse. The Board cites to Wyo. Stat. Ann. § 24–1–101(d) ("[o]nly that portion of county highways ... actually constructed or substantially maintained by the county and travelled and used by the general public for ... [ten years] ... shall be presumed to be public highways lawfully established as such by official authority") and language in *Hinckley*, 593 P.2d at 580, that "in order to establish a public road by prescription, a county need only meet the requirements set forth in § 24–1 [the statute's prior number]...." Next, the Board quotes our discussion in *Steplock*, 894 P.2d at 605 (*quoting Patrick*, 107 P. at 750) regarding the "substantive" aspect of Wyo. Stat. Ann. § 24–1–101, namely that it " 'should be shown, in addition to the use of a road by the public, the assumption of control and jurisdiction over it by the board ...' " and that it is "[u]se by the public, coupled with maintenance by the county, [that] gives rise to the right to establish a county road by prescription...." Finally, the Board points to language in *Koontz*, 746 P.2d at 1268, that a property owner's failure to "interrupt or object to the public use" of the road "cannot be equated to permissive use" and that if

the private landowner establishes through competent evidence that the public's use is merely permissive, the question of supervision, control or maintenance is irrelevant. If the landowner fails to establish permissive use, he is still entitled to a presumption of permissive use **unless** the public authority establishes that it has assumed supervision or control of the road or has kept it in repair.

(Emphasis in original.)

[¶ 43] The authority cited by the Board does not convince us that a public claimant bears any lighter burden than a private claimant *per se*. In a case originating under Wyo. Stat. Ann. § 24–1–101, we stated that, by "expressly referring to the common-law doctrines, the statute incorporates the prior decisions of this court." *Steplock*, 894 P.2d at 605. Accordingly, neither the statutory text, nor the language cited from *Koontz* and *Steplock*, undermine this statement or qualify our prior decisions based on the common law. A county's construction or maintenance of a road is certainly evidence of its control and jurisdiction of the road, which is necessary, no matter what analytical framework is utilized in evaluating the evidence, to demonstrate that its use is adverse and under a "claim of right in the public." The Board's reliance on the addi-

tional sentence in *Hinckley* ("a county need only meet the requirements set forth in § 24–1") is misplaced, as that sentence concluded a discussion of whether a public claimant must, in addition to the requirements of Wyo. Stat. Ann. § 24–1–101, also pay damages for a prescriptive easement pursuant to the condemnation statutes. *Hinckley*, 593 P.2d at 580. We held that a public claimant need only satisfy the requirements of what is now Wyo. Stat. Ann. § 24–1–101, and not those set forth in the condemnation statutes. *Hinckley*, 593 P.2d at 580.

[¶ 44] Considerable argument is devoted to the application of presumptions in evaluating the evidence adduced at the contested case hearing, which coincides with the Board's argument that a public claimant bears a lighter burden of proof. Our prior decisions refer to or apply several such presumptions. "The land in question being unimproved and unenclosed prairie land until some public authority, acting within its proper sphere, assumed supervision or control of the road or kept it in repair, the use of it by the public will be deemed to have been permissive by the owner." *Patrick*, 104 P. at 532. The Board utilized this presumption in evaluating the evidence it received in this case.

[¶ 45] In *Koontz*, 746 P.2d at 1268, which involved a claimed public prescriptive easement (though not pursuant to Wyo. Stat. Ann. § 24–1–101), we applied the following principles in reviewing the record. Public use of a road will be deemed permissive unless a public authority has assumed supervision and control of the road or has kept it in repair. *Koontz*, 746 P.2d at 1268. If the landowner establishes that the public's use is merely permissive, the question of supervision, control or maintenance is irrelevant because a prescriptive easement cannot be acquired if the use is permissive. *Id.* If permissive use is not established, the landowner is still entitled to a presumption of permissive use unless the public authority establishes that it has assumed supervision or control of the road or has kept it in repair. *Id.* The Board similarly referred to these principles in its legal findings.

[¶ 46] In cases involving a claimed private easement by prescription, we have said that a

"landowner claiming an easement by prescription in an unimproved road crossing the lands of his neighbor must assume the burden of establishing that his intention to make a hostile use of the road adverse to the interests of his neighbor was brought home to the neighbor in a clear and unequivocal way. His subjective intent will not be considered material, and while it is likely true that a manifestation of his hostile and adverse intent will result in revocation of permission to use the road across the neighbor's land, this is the best posture for the law to assume in the State of Wyoming. The claimant cannot rely upon a presumption [of hostile and adverse use] arising out of the open, notorious, continuous and uninterrupted use for the prescriptive period, but in the absence of more that use will be presumed to have been with permission. To rebut this presumption the claimant must introduce evidence of the facts which demonstrate the manner in which the hostile and adverse nature of his use was brought home to the owner of the adjacent land."

*A.B. Cattle Co.*, 943 P.2d at 1188 (*quoting Weiss*, 933 P.2d at 501). This concept stems from the fact that "neighborliness and accommodation to the needs of a neighbor are landmarks of our western life-style." *A.B. Cattle Co.*, 943 P.2d at 1189. The Board decided not to apply this presumption in evaluating the evidence before it.

[¶ 47] The authority cited by the Board does not necessarily establish an evidentiary presumption of adverse use in favor of the claimant in this case, except that, as in most cases, once a claimant produces **sufficient** evidence to establish a *prima facie* case, the burden then shifts to the opposing party. *Hillard v. Marshall*, 888 P.2d 1255, 1260 (Wyo.1995); *Shumway*, 637 P.2d at 669–70. We note that in *Hinckley*, 593 P.2d at 579, 580, a case originating under a prior version of Wyo. Stat. Ann. § 24–1–101, we first cited to decisions requiring that a public claimant take formal, official action in order to establish a prescriptive easement, and

stated the following regarding what is now Wyo. Stat. Ann. § 24–1–101(d):

> *After* these cases were decided, the legislature enacted legislation creating a *presumption of official establishment* of state highways where there was public use for the prescribed period. This presumption of official establishment was subsequently extended to county highways, and then, in 1973, specific procedures were established to govern a county's acquisition of a road by prescription.
>
> The 1973 amendments are consistent with our previous holdings that a county must take official action—including a declaration of purpose to acquire the lands and the filing of a survey plat of the proposed roads—before it can acquire a road by prescription.

(Emphasis in original.) Further, a presumption of adverse use does not

> "arise where the user is shown to be permissive in its inception, or where it is not shown to have continued for the prescriptive period; *nor, in the absence of some decisive act indicating separate and exclusive use, does it arise where the user is not inconsistent with the rights of the owner, as, for instance, where the user is in connection with that of the owner or the public or is claimed with respect to unoccupied, uninclosed, and unimproved lands, the use in such cases being presumed to be permissive and in subordination to the owner's title.*"

*Shumway,* 637 P.2d at 669 (*quoting* 28 C.J.S. *Easements* § 68 at 736–37 (1941)) (emphasis in original). In this regard, we also stated in a case involving a private claimant, the following:

> The appellants argue that, under *Shumway v. Tom Sanford, Inc.,* 637 P.2d 666 (Wyo.1981), they are entitled to a presumption that their use of the roadway was adverse. The appellants misread the *Shumway* case. In that case, this Court recognized that our prior decisions were inconsistent with regard to whether, in establishing prescriptive easements, a presumption existed that the use was hostile or a presumption existed that the use was permissive. 637 P.2d at 669.

*Weiss,* 933 P.2d at 501. The opinion went on to say that we "resolved that inconsistency" in *Shumway,* quoting the previously-referenced excerpt regarding the presumption arising from "neighborliness" (*Shumway,* 637 P.2d at 670). *Weiss,* 933 P.2d at 501. Similarly, it "must be further remembered that prescriptive easements are not favored in law, and thus entry into another's possession is presumed to have been with the landowner's permission absent evidence of a hostile entry." *Caribou Four Corners, Inc. v. Chapple–Hawkes, Inc.,* 643 P.2d 468, 471 (Wyo. 1982).

### SUFFICIENCY OF THE EVIDENCE

[¶ 48] It is quite easy to become lost in the "trees" of presumptions and shifting burdens of proof, and lose sight of the "forest"—the sufficiency of the evidence as to whether the claimant's use was adverse or permissive. A presumption is merely a "required conclusion in the absence of explanation." *Hillard,* 888 P.2d at 1259. Reliance on a particular presumption does not change or heighten the standard of proof; a presumption shifts the burden of proof.

> A presumption is not a magic elixir that imbues its holder with an exalted level of protection against an evidentiary attack. A presumption simply means that in the absence of any other evidence to the contrary, the fact presumed is conclusive. If, however, there is sufficient evidence to the contrary, then it becomes a question of weight and credibility for the trier of fact.

*Id.* at 1260. In reality, what the parties dispute in this case is the sufficiency of the evidence to support the Board's finding that the use of Coal Creek road was adverse or under a claim of right, as opposed to permissive. The Board's key factual findings in this regard include:

1. The public traveled Coal Creek road "with no permission being asked for or given;"

2. P & M's policy was to permit public access to its open range land and to only restrict public access to those areas where active mining occurred. P & M was not aware that Coal Creek road was being maintained but was aware of the construc-

tion of the bridge. P & M "did not" consider the installation of the bridge or the maintenance of Coal Creek road by the county to be a lawful permissive use;

3. No member of the public, county official, or county employee ever asked permission to use Coal Creek road "and none was given." P & M and Kemmerer Coal Company did not ever deny access to Coal Creek road;

4. Any lack of knowledge regarding the county's maintenance indicates that the owner was simply indifferent;

5. Because there was no express permission given by any landowner for the public use or county maintenance, and because "there is no evidence of any effort being made to restrict public use" or county maintenance, the road "was used and maintained as a public or county road until 1988."

6. The public's use and county's maintenance "was adverse to the owners' interest, was done under claim of right and in such a manner as would cause a reasonable person to know the use was adverse."

[¶ 49] In light of these findings, we consider the following facts to be dispositive. The facts are essentially undisputed or uncontradicted, and the Board did not question the credibility of any witness.

[¶ 50] Until the Cooks acquired the subject property in "remote" Lincoln County, it was "unenclosed" and considered to be "open range." This case is a bit unique in that the Cooks' predecessors were corporate owners of substantial acreage. Coal Creek road has historically served several purposes in addition to its owners' purposes, including providing access to adjacent private property, from adjacent private property to other private and public property for ranching purposes, and to private and public property for governmental and recreational purposes.

[¶ 51] Contrary to the Board's findings, the record does contain evidence of permissive use by the public and/or the county. It was P & M's policy to allow these forms of "permissive lawful public use" on its thousands of acres of open range property, as

opposed to its active mine sites, in recognition of an established "course of dealing" to facilitate the use of private and public property via roads including Coal Creek road.[8] This approach is not unusual among corporate owners of substantial acreage in south Lincoln County. The Board found that Kemmerer Coal Company's position "with regard to the use of the Road while it owned the property" did not appear "to be different than P & M's position," and there is no evidence that anyone else owned the subject property during the relevant time period. Significantly, Ms. Peternal acknowledged that during her tenure on the Board, it was "pretty well known" to her, the Board and the "community at large" that Kemmerer Coal Company allowed public access to its property in this manner.

[¶ 52] The testimony of ranchers who owned, or had owned, property along Coal Creek road, and that of the public, regarding their use of Coal Creek road is entirely consistent with this policy. Most individuals did not ask permission to use the road or property, as one witness phrased it—because they never "had to," and the property's owners never denied anyone access for the stated purposes. However, when permission was asked, it was given—this case is not one of mere silence by the property's owners. The Lincoln County search and rescue unit's former commander discussed accessing this property with P & M and received express permission from P & M to cross or access the property for search and rescue purposes. Further, Mr. Krall recalled that "whenever you wanted to build, you know, a portion of the road and it was better for the road to be there, Kemmerer Coal would just give you permission to—and the county permission to do it." He also altered part of the road passing through his property and "through P & M," and P & M "thought if you put the road in a better position and if they happened to move their industry up there, it would be better for them, too, to have an improved road."

 [¶ 53] A public roadway cannot be acquired by mere permissive public use, for

8. Such policies might be more effectively communicated by posting or publication.

if a "private landowner establishes through competent evidence that the public's use is merely permissive, the question of supervision, control or maintenance is irrelevant." *Koontz*, 746 P.2d at 1268. Based on its findings that no permission was ever "asked or given" regarding anyone's use of Coal Creek road, the Board essentially equated the landowners' "policy" with a categorical and unsupported assertion that the public's and/or county's use of Coal Creek road was permissive.

[¶ 54] In *Koontz*, 746 P.2d at 1268, an appeal from an order granting summary judgment to the claimant, the only evidence indicating permissive use by the claimant was a statement in an affidavit that the landowner " 'permissibly allow[ed]' the property to be used as a roadway," and a statement in another affidavit that " 'if the Town of Superior had in any way informed me of or expressed the intention to claim Lots 20 and 21 as its own, I would have denied use of that property as a roadway.' " We found that the first statement was a "categorical" assertion of ultimate fact without supporting evidence and that a mere failure on the part of the landowner to interrupt or object to the public use cannot be equated to permissive use. *Id.* In the absence of other evidence of permissive use, no genuine issue of material fact existed as to whether the use was adverse. *Id.*

[¶ 55] The evidence we outlined regarding the permissive use of Coal Creek road clearly exceeds that presented by the landowner in *Koontz*, and in light of this evidence, the Board's findings that the use of the road was adverse, as opposed to permissive, were not supported by substantial evidence. Even so, the objective context in which the maintenance of Coal Creek road occurred is important in evaluating whether the maintenance was sufficient to show the county's assumption of control and jurisdiction over the road, or a "claim of right in the public." [9] There is no evidence that Lincoln County originally constructed Coal Creek road. The county's maintenance of Coal

Creek road mainly consisted of periodic "blading." The county historically maintained roads "commonly accepted" as county roads as well as private roads, and by 1979, the county had plowed private ranch roads "for years" without a set schedule. From its inception, much of the county's maintenance of the road appears to have been performed to appease the specific requests of its constituent ranchers in that area and those with area business operations (i.e., Continental Oil).

[¶ 56] By 1980, Lincoln County had only one dedicated county road, which it attempted to vacate for unspecified reasons. That same year, the Board decided not to attempt to establish Coal Creek road as a county road. The record does not indicate why the Board considered establishing the road as a county road nor precisely why it did not do so. In 1980, the Board began discussing whether it should continue to maintain private ranch roads, and quit maintaining private ranch roads in 1981, 1984, 1985, 1986, or 1988, depending on the testimony. Not coincidentally, the county quit maintaining Coal Creek road as early as 1986. The Board found that after 1988, the county "wanted to avoid the expense of maintaining and establishing the Road and simply took the position that it was not a county road." We were unable to identify substantial evidence in the record to support this finding, although the extent to which the county considered Coal Creek road a private road is consistent with the county's historical maintenance practices. Notably, once the county quit maintaining Coal Creek road, private parties continued blading the road and maintained the bridge.

[¶ 57] The only other significant maintenance the county performed on Coal Creek road was related to a flatbed railroad car bridge it installed in 1981, soon after the Board decided not to attempt to establish the road as a county road. This, too, was requested by the "people up there" to facilitate ranchers' use of the road, but purportedly also for the general public. It was not unprecedented for the county to install bridges

9. Our consideration of this evidence does not implicate issues not expressly before us (i.e., es- toppel or abandonment).

on private property, having placed two bridges on Ms. Peternal's private property prior to 1981 without the property owner's knowledge, yet, according to Ms. Peternal, somehow with the owner's permission. The county also placed a bridge on Calvin Barnes' private property, although pursuant to an express agreement. The record does not indicate what other bridges the county has installed or maintained on private or public property in Lincoln County. Contrary to the Board's finding, the entirety of Mr. Ellinwood's testimony indicates that P & M was aware of the county's maintenance and regarded it as a "permissive use," which is also evidenced by Mr. Krall's testimony regarding his experience with Kemmerer Coal Company and P & M when working on portions of the road.

[¶ 58] Based on this evidence, we similarly conclude that the Board's finding that Lincoln County's maintenance sufficiently established its assumption of control and jurisdiction over the road, or a "claim of right in the public," was not supported by substantial evidence.

[¶ 59] The decision of the district court is affirmed.